183 F.3d 139 (2nd Cir. 1999)
 UNITED STATES OF AMERICA, Appellee,
v.
JOHN BRENNAN, President and Chief Executive Officer of United States Aviation Underwriters, Inc.; and UNITED STATES AVIATION UNDERWRITERS, INC., Defendants-Appellants.
 Docket No. 97-1440
August Term, 1997
 UNITED STATES COURT OF APPEALS
SECOND CIRCUIT
 Argued April 30, 1998
Decided July 07, 1999
 
 Defendants appeal from judgments of conviction for mail fraud, 18 U.S.C. § 1341, imposed by the United States District Court for the Eastern District of New York (Sifton, C.J.). They argue, among other things, that venue was not properly laid in the Eastern District. The only asserted basis of venue alleged was that mailings passed through the Eastern District en route to delivery elsewhere.
 Reversed.
 ALAN B. VICKERY, Assistant United States Attorney, Brooklyn, N.Y. (Zachary W. Carter, United States Attorney for the Eastern District of New York, Brooklyn, N.Y., Peter A. Norling and Lee G. Dunst, Assistant United States Attorneys, Of Counsel), for Appellee.
 GERARD E. LYNCH, New York, N.Y. (Cynthia Soohoo, Howard Smith & Levin LLP, New York, N.Y., Edward A. McDonald, Reboul, MacMurray, Hewitt, Maynard & Kristol, New York, N.Y., Of Counsel), for Defendant-Appellant John Brennan.
 ANDREW L. FREY, New York, N.Y. (Julie E. Katzman, Mayer, Brown & Platt, New York, N.Y., Of Counsel, David M. Zornow, Lawrence S. Spiegel, Skadden, Arps, Slate, Meagher & Flom, LLP, New York, NY, Timothy T. McDaffrey, General Counsel, United States Aviation Underwriters, Inc., New York, NY, On the Brief), for Defendant-Appellant United States Aviation Underwriters, Inc.
 William F. Sheehan, Frederick C. Schafrick and Jeffrey C. Martin, Shea & Gardner, Washington, D.C. (On the Brief), for Amici Curiae, Assurance France Aviation, British Aviation Insurance Group, Ltd., La Reunion Aerienne, and Lloyd's Aviation Underwriters' Association.
 David J. Grais, Michael C. Zeller, elice Berkman Brewer, Grais & Phillips LLP, New York, N.Y. (On the Brief), for Amici Curiae, Alliance of American Insurers, American Insurance Association, National Association of Independent Insurers, National Association of Mutual Insurance Companies, and Reinsurance Association of America.
 Eugene R. Anderson, Anderson Kill & Olick, P.C., New York, N.Y. (On the Brief), for Amicus Curiae, United Policyholders.
 Before: NEWMAN and LEVAL, Circuit Judges, and WEXLER, District Judge.*
 LEVAL, Circuit Judge:
 
 
 1
 Defendants John Brennan and United States Aviation Underwriters, Inc. ("USAU") appeal from judgments of conviction entered July 25, 1997 in the United States District Court for the Eastern District of New York (Sifton, C.J.). Following a seven-week jury trial, defendants were found guilty of mail fraud under 18 U.S.C. § 1341. The charges stemmed from USAU's role in managing the insurance arrangements, claims, and litigation on behalf of its insured, an airline, in the aftermath of a December 1987 airplane crash. The government alleged that USAU and Brennan, USAU's President and Chief Executive Officer, committed fraud against USAU's insured, its coinsurers, and its reinsurers by failing to disclose information regarding a possible conflict of interest and regarding certain facts pertinent to the airline's liability in derogation of asserted fiduciary duties and by making affirmative misrepresentations.
 
 
 2
 On appeal, defendants contend, inter alia, that the prosecution violated principles of lenity and due process insofar as it was based on the existence of fiduciary duties; that the jury charge defining fiduciary duties was improper; that there was insufficient evidence of affirmative misrepresentations to sustain the convictions; and that venue was improperly laid. Each of these contentions raises serious concerns. We reverse on the ground that venue was improper in the Eastern District of New York.
 
 BACKGROUND
 
 3
 USAU, of which Brennan was at all relevant times President and Chief Executive Officer, acts as manager for an unincorporated consortium of some 15 insurance companies, known as United States Aircraft Insurance Group ("USAIG"). The consortium's members pool their resources to insure aviation-related risks. USAU does not directly provide insurance or bear insurance risk, but instead writes liability and casualty insurance policies, collects policy premiums, investigates losses and claims, and manages claims litigation, all on behalf of USAIG.
 
 
 4
 During the period at issue in this case, USAIG was the lead insurer for the airline USAir. As is common in the airline industry, USAir's liability insurance was divided between several -- in this instance, seven -- insurers. Each of these "coinsurers" bore a specified share of any covered liabilities incurred by USAir. USAIG bore 29 percent of the USAir risk. USAIG/USAU was designated "lead" insurer of this group of coinsurers. Accordingly, pursuant to contract, the airline and the other coinsurers agreed that USAU would have primary responsibility for managing the claims process for the USAir policies; in the event of a covered accident, these responsibilities included retaining counsel to represent the airline in connection with any lawsuits and directing and controlling the airline's defense. In addition, USAU was required to estimate the airline's likely total liability arising from the accident and the amount of the financial reserve that should be established by the coinsurers against these potential liabilities; each coinsurer would then contribute an amount to the reserve based on the portion of the USAir liability coverage they held. USAU was also primarily responsible for determining appropriate settlement amounts for claims against the airline, notifying the coinsurers of these settlements, and making settlement payments from either the reserve fund or, if necessary, from additional proportional contributions from the coinsurers.
 
 
 5
 For their part, the coinsurers retained certain contractual rights regarding claims handling. For example, with respect to all claims with a gross reserve in excess of $100,000, they retained the right to "full and complete access by attorneys or investigators of their own choosing, but at their own costs, to all files, materials and information developed by USAIG" and the right "to participate in the . . . handling and supervision of such claim or claims." USAIG/USAU received a fee from the coinsurers for its claims-handling duties.
 
 
 6
 With respect to the 29 percent of the USAir insurance coverage written by USAU on behalf of USAIG, USAIG did not actually retain insurance risk. Instead, acting on USAIG's behalf USAU purchased "reinsurance" from other insurance companies to cover USAIG's share of the USAir risk. It is undisputed that all of USAIG's risk for passenger liability claims under the USAir policy was reinsured. Like coinsurance arrangements, reinsurance is common in USAU's industry, and, like USAIG, the other insurers of USAir reinsured most of their risk. USAIG's reinsurers relied in large part upon USAU to perform claims-handling duties, such as managing the investigation, litigation, and settlement of claims. USAU received a claims-handling fee for this service.
 
 
 7
 On December 7, 1987, a Pacific Southwestern Airlines ("PSA") airplane en route from Los Angeles to San Francisco ("Flight 1771") crashed, killing all 43 people on board. It was quickly determined that the crash was caused by a disgruntled former employee of USAir, David Burke, who had boarded Flight 1771 with a handgun and used it to shoot his former supervisor (a passenger on the plane), the pilot and the co-pilot. PSA, which was in the process of being acquired by USAir, was covered by USAir's insurance.
 
 
 8
 USAU's role as lead insurer for USAir required it to take steps to assess and prepare for the expected litigation arising out of the crash. However, USAU had a similar responsibility regarding another potentially liable party, Ogden-Allied Corporation ("Ogden"), an aviation ground services company that operated the passenger security screening checkpoint for PSA at Los Angeles International Airport ("LAX"). USAIG, acting through USAU, was Ogden's sole primary insurer; unlike with the USAir policy, there were no coinsurers. In addition, while USAU had arranged for reinsurance of some of the Ogden risk, part of USAIG's risk under the Ogden policy was not covered by reinsurance. Because there was a possibility that Burke had smuggled the handgun past the Ogden checkpoint, and that Ogden had failed to follow applicable Federal Aviation Administration regulations in screening him, it faced potential liability.
 
 
 9
 USAU undertook to act in its capacity as lead insurer for both USAir and Ogden. It hired separate counsel for USAir and for Ogden, and monitored their investigation of likely liability exposure. Soon after the crash, Brennan expressed the view that it was a "USAir accident." USAU thus set a provisional $55 million reserve to cover USAir's anticipated liability while setting only a $1 million reserve for Ogden's legal and related expenses.
 
 
 10
 As expected, some 44 wrongful death suits were brought against, among others, USAir/PSA, Ogden, and LAX by survivors of the passengers and crew of Flight 1771. Under USAU's direction, all but nine of these suits were settled by May 1989. A consolidated jury trial of the remaining cases began in California state court on June 1, 1989 ("the civil case"). USAir/PSA, Ogden, and LAX litigated pursuant to a common strategy of placing sole blame for the crash on Burke -- against whose estate they brought a third-party claim. They argued that Burke was an "unstoppable force," determined and able to circumvent all security measures. During the week of June 19, four of the nine cases settled. On June 22, Brennan instructed John Papageorge, a USAU employee, to settle the remaining cases. This was accomplished within five days. As a result, no jury verdict was returned against USAir or Ogden or any other defendant.
 
 
 11
 After resolution of the civil case, USAU adhered to its initial determination that the settlement costs should be allocated to USAir's policy (and hence to the coinsurers and reinsurers of the USAir risk) rather than to Ogden's policy.[1] Following some discussion between USAU and USAir personnel regarding allocation of responsibility, USAU sent a letter to USAir (through its insurance broker) dated August 30, 1989 ("the August 30 letter") explaining its determination that "Ogden Allied and LAX had little if any potential exposure in the trial." In addition, USAU sent a six-page letter dated July 6, 1989 ("the July 6 letter") to its coinsurers and apparently at least one reinsurer of USAIG's USAir risk, offering a brief summary of the trial and the settlements and stating USAU's conclusion that "[a]s the evidence unfolded, it appeared that USAir was at significantly greater risk than the other defendants." Of USAir, the coinsurers, and the reinsurers none ultimately contested USAU's allocation.
 
 
 12
 According to the government, USAU's management of the litigation and its allocation decision was distorted by a conflict of interest, under which USAU/USAIG gained a financial advantage by allocating the loss to USAir instead of Ogden.[2] In particular, the government points to the fact USAU had apparently failed fully to reinsure USAIG's risk on the Ogden policy; because of this reinsurance gap, USAIG was potentially responsible for up to $7.5 million of Ogden's liability.[3] Thus, whereas USAIG would have no non-reinsured liability if the entire amount of the settlements was allocated to USAir's policy, it might be liable for up to $7.5 million if Ogden was allocated a share.
 
 
 13
 The government instituted this criminal prosecution against USAU and Brennan in the Eastern District of New York in May 1995. The superseding indictment, dated October 18, 1995, alleged 43 counts of mail fraud. According to the government's theory of the case, USAU and Brennan defrauded (i) USAir, (ii) USAIG's coinsurers of the USAir risk, and (iii) USAIG's reinsurers of the USAir risk in two basic ways. First, the government contends that USAU and Brennan, acting on behalf of USAIG, owed a fiduciary duty to USAir as its insured, to the coinsurers, and to the reinsurers. USAU and Brennan breached these fiduciary duties, according to the government, by failing to disclose the conflict of interest that arose out of the $7.5 million reinsurance gap on the Ogden policy as opposed to the complete reinsurance on the USAir policy. In addition, USAU and Brennan allegedly breached these duties by failing to disclose information suggesting that Ogden likely faced substantial liability in connection with the Flight 1771 accident and thus should have had some portion of the settlement amounts allocated to its policy. Second, the government contends that USAU and Brennan made affirmative misrepresentations to USAir, the coinsurers, and the reinsurers -- including in the July 6 letter and the August 30 letter -- that led the victims to accept, rather than question, USAU's handling of the Flight 1771 claims and litigation and its allocation of all responsibility to USAir. On May 1, 1996, the district court denied or deferred decision of the issues raised in the defendants' motion for dismissal of the indictment. See United States v. Brennan, 938 F. Supp. 1111 (E.D.N.Y. 1996). The case was tried from May 10 to July 1, 1996. The jury returned a guilty verdict against both USAU and Brennan on all 43 counts. In an opinion dated March 19, 1997, the court dismissed two counts for failure of proof of mailing but denied defendants' other post-trial motions. The court sentenced USAU to a fine of $20,500,000, a term of five years probation with special terms including an independent committee to monitor its handling of future claims, an order of restitution in the amount of $20,625,000, and a special assessment. Brennan was sentenced to 57 months imprisonment, a fine of $100,000, and a special assessment.
 
 
 14
 This appeal followed.
 
 DISCUSSION
 I. Venue
 
 15
 A. Was venue proper in the Eastern District?
 
 
 16
 Defendants argue that venue was improper in the Eastern District of New York. According to the government, venue was proper because the mailings underlying each count of conviction "traveled through" the Eastern District. Each of the mailings was either sent from USAU's offices in lower Manhattan (which is in the Southern District of New York) to Texas, France, or England or was received at the Manhattan offices from Texas, Seattle, or California. It is undisputed that none of the letters was sent from or received in the Eastern District. A United States Postal Services employee testified at trial that the normal practice during the period in question was to route mail sent between lower Manhattan and Texas, England, or France through John F. Kennedy or LaGuardia airports, both of which are located in the Eastern District. According to the government and the district court, this sufficed to establish venue in the Eastern District.[4]
 
 
 17
 The Sixth Amendment to the Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law."[5] See also Fed. R. Crim. P. 18 ("Except as otherwise permitted by statute or by these rules, the prosecution shall be had in a district in which the offense was committed."). In order to determine whether prosecution was proper in the Eastern District, we therefore must ascertain where the crimes with which USAU and Brennan were charged were "committed." As the Supreme Court has recently reiterated, "[T]he 'locus delicti [of the charged offense] must be determined from the nature of the crime alleged and the location of the act or acts constituting it.'" United States v. Rodriguez-Moreno, 526 U.S. 275, 119 S.Ct. 1239, 1242, 143 L.Ed.2d 388 (1999)(alteration in the original) (quoting United States v. Cabrales, 524 U.S. 1, 6-7 (1998)). In so doing, we look at "the key verbs which define the criminal offense in the statute," United States v. Chestnut, 533 F.2d 40, 46-47 (2d Cir. 1976); accord United States v. Delia, 944 F.2d 1010, 1013 (2d Cir. 1991); United States v. Stephenson, 895 F.2d 867, 874 (2d Cir. 1990); United States v. Slutsky, 487 F.2d 832, 839 (2d Cir. 1973); Wright, supra, § 302, at 196.
 
 
 18
 Section 1341, the mail fraud statute, provides that it shall be a crime to
 
 
 19
 place[] in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposit[] or cause[] to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or take[] or receive[] therefrom, any such matter or thing, or knowingly cause[] to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing
 
 
 20
 when done for the purpose of executing a scheme to defraud. 18 U.S.C. § 1341. Thus, applying these standards to the instant case, venue would be proper in the Eastern District if Brennan and USAU (1) "place[d]" (or caused to be placed) in an authorized depository in the Eastern District mail underlying the indictment, (2) took or "receive[d]" such mail in the Eastern District, or (3) "knowingly cause[d]" such mail "to be delivered" in the Eastern District. The government does not contend that any of these conditions was satisfied.
 
 
 21
 We must consider nonetheless whether the concept of venue promulgated by the Supreme Court's recent decision in Rodriguez-Moreno could justify prosecution in the Eastern District of New York. In Rodriguez-Moreno, the Court cautioned against overly restrictive reliance on a "verb test." 119 S. Ct. at 1243. Recognizing that essential conduct elements may be "embedded in a prepositional phrase and not expressed in verbs," the Court asserted that "verbs are [not] the sole consideration in identifying the conduct that constitutes an offense." Id.
 
 
 22
 The crime in Rodriguez-Moreno was a violation of 18 U.S.C. § 924(c)(1), which prohibits the use or carrying of a firearm during and in relation to a crime of violence. See id. at 1243. The crime of violence in that case was kidnapping. The Court emphasized that the crime being prosecuted under § 924(c)(1) was not limited to the use or carrying of the firearm (which occurred only in Maryland), but included also the kidnapping (which was carried out in several states including New Jersey, the forum state). Because the offense consisted of "distinct parts which have different localities the whole may be tried where any part can be proved to have been done." Id. at 1244 (quoting United States v. Lombardo, 241 U.S. 73, 77 (1916)). As New Jersey was an appropriate venue for the prosecution of the kidnapping offense, the § 924(c)(1) offense of carrying a firearm during and in relation to the kidnapping "could be tried there as well." Id.
 
 
 23
 We cannot tell whether the reasoning of Rodriguez-Moreno would make venue appropriate for a prosecution under § 1341 not only in districts where mail matter was sent or received in furtherance of the fraud scheme, but also in any district where any aspect of the "scheme or artifice to defraud," 18 U.S.C. § 1341, was practiced. But we need not answer that question in this case, for the government does not contend that the defendants either devised or executed the fraud in the Eastern District of New York.
 
 
 24
 The sole basis on which the government relies for establishing venue in the Eastern District is the fact that letters mailed in Manhattan (in the Southern District of New York) to other parts of the country or to Europe or received in Manhattan from Europe or other parts of the country are likely to have passed through the John F. Kennedy or LaGuardia airports in the Eastern District of New York.
 
 
 25
 Section 3237(a), Title 18, U.S. Code, provides that:
 
 
 26
 Any offense involving the use of the mails . . . is a continuing offense and, except as otherwise expressly provided by enactment of Congress, may be inquired of and prosecuted in any district from, through, or into which such . . . mail matter . . . moves.
 
 
 27
 18 U.S.C. § 3237(a). The government contends that this statute applies to the crime of mail fraud under § 1341. It is clear that if venue was indeed available "in any district . . . through . . . which" the mailings at issue in this case passed, prosecution in the Eastern District was appropriate. Defendants maintain, however, that § 3237(a) does not apply to mail fraud prosecutions. Their argument rests on the contention that the mail fraud statute does not proscribe conduct involving "the use of the mails" within the meaning of § 3237(a). We agree. Though perhaps surprising, this conclusion is strongly supported by consideration of the history and purpose of § 3237(a) and the constitutional protection of defendants' venue rights.
 
 
 28
 As defendants point out, the relevant portion of § 3237(a) was passed by Congress in response to the Supreme Court decision in United States v. Johnson, 323 U.S. 273 (1944). Johnson involved a prosecution under the National Denture Act of 1942, 56 Stat. 1087, the current version of which is codified at 18 U.S.C. § 1821. The statute generally made it unlawful "to use the mails or any instrumentality of interstate commerce for the purpose of sending or bringing into" any state or territory a denture constructed from a cast not taken by a dentist licensed to practice in the state into which the denture was sent. The defendants were charged with having violated the statute by depositing illicit dentures into the mails at Chicago for delivery in Delaware. See 323 U.S. at 274. The government filed an information against defendants in Delaware. See id. The information was quashed on the ground that venue was proper only in the Northern District of Illinois. See id.
 
 
 29
 The Supreme Court affirmed, construing the statute to permit "trial of the sender of outlawed dentures to be confined to the district of sending, and that of the importer to the district into which they are brought." Id. at 275. The Court acknowledged that Congress was empowered expressly to create a "continuing offense" by, in effect, defining "the locality of a crime [to] extend over the whole area through which force propelled by an offender operates"; if Congress had utilized this power in the denture context, the Court stated, the sender would have been subject to prosecution in the district of sending, in the district of arrival, and in any intervening district. See id. However, "such leeway not only opens the door to needless hardship to an accused by prosecution remote from home and from appropriate facilities for defense. It also leads to the appearance of abuses, if not to abuses, in the selection of what may be deemed a tribunal favorable to the prosecution." Id.
 
 
 30
 Emphasizing that "[t]hese are matters that touch closely the fair administration of criminal justice and public confidence in it, on which it ultimately rests," Johnson articulated a rule favoring restrictive construction of venue provisions: "[i]f an enactment of Congress equally permits the underlying spirit of the constitutional concern for trial in the vicinage to be respected rather than to be disrespected, construction should go in the direction of constitutional policy even though not commanded by it." Id. at 276. Accordingly, the Court embraced the narrow interpretation of the National Denture Act, under which defendants were subject to prosecution only in the district of sending, as "more consonant with the considerations of historic experience and policy which underlie [the venue] safeguards in the Constitution." Id. at 275.
 
 
 31
 As noted, Congress passed § 3237(a) in response to Johnson. See Reviser's Note, 18 U.S.C.A. § 3237(a); Pratt v. First California Co., Inc., 517 F.2d 11, 13 (10th Cir. 1975). In doing so, Congress did what Johnson indicated it could: it expressly determined that offenses involving "the use of the mails" were "continuing offenses." This not only mooted the Court's interpretation of venue under the National Denture Act, but also made the Johnson rule of construction inapplicable to other statutes defining offenses involving "the use of the mails." There are today many such statutes that expressly prohibit "use of the mails" in connection with various activities or for various purposes. See, e.g., 18 U.S.C. §§ 43(a)(1) (animal enterprise terrorism); 514(a)(3) (false or fictitious instruments or obligations); 844(e) (threats or false statements concerning explosive materials); 1461 (obscene or crime-inciting matter); 1717(b) (miscellaneous nonmailable matter); 1735(a)(1) (sexually oriented advertisements); 1738(a) (private identification documents without disclaimer); 1952(a) (various unlawful activities); 2101 (inciting, and other activity connected to, riots); 2332b(b)(1)(A) (acts of terrorism transcending national boundaries).
 
 
 32
 Passage of § 3237(a), however, could not and did not alter the constitutional and policy concerns underlying the Court's restrained view of venue; and it did not affect the general validity of the Johnson rule of construction. See, e.g., United States v. Cores, 356 U.S. 405, 407 (1958)("The provision for trial in the vicinity of the crime is a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place. Provided its language permits, the Act in question should be given that construction which will respect such considerations."); Travis v. United States, 364 U.S. 631, 634 (1961)("[V]enue provisions in Acts of Congress should not be so freely construed as to give the Government the choice of a 'tribunal favorable' to it."); id. at 640 (Harlan, J., dissenting).
 
 
 33
 In light of the Johnson policies, we agree with defendants that § 3237(a) is best read as not applying to statutes, like the mail fraud statute, that specify that a crime is committed by the particular acts of depositing or receiving mail, or causing it to be delivered, rather than by the more general and ongoing act of "us[ing] the mails." Rather than make a defendant like Brennan subject to prosecution in any district through which a mail truck carrying his mail happened to drive (or perhaps even in any district over which an airplane carrying the mail happened to fly, or in which it happened to make an interim stop), we think Congress's more particularized and careful phrasing in the mail fraud statute takes it outside the scope of § 3237(a) and is best read less expansively. We therefore hold that prosecution under the mail fraud statute is permissible only in those districts in which a proscribed act occurs, i.e., in which the defendant "places," "deposits," "causes to be deposited," "takes," or "receives" mail or "knowingly causes" mail "to be delivered."[6]
 
 
 34
 We are not the first court to reach this interpretation of § 3237(a); the same view was embraced by the Tenth Circuit in United States v. Ross, 205 F.2d 619 (10th Cir. 1953). Ross involved a prosecution under the then-current version of 18 U.S.C. § 1461, which made subject to punishment anyone who "knowingly deposits for mailing or delivery, anything declared by this section to be nonmailable." 205 F.2d at 620. The court held that § 3237(a) was not applicable to the offense of "knowingly depositing for mailing or delivery" such material, reasoning that
 
 
 35
 there is a clear distinction between a deposit for mailing or delivery and the use of the mails. The use of the mails continues from the point of deposit to the point of delivery. Crimes involving the use of the mails are therefore continuing crimes, but the unlawful act defined in § 1461 is the deposit for mailing and not a use of the mails which may follow such deposit. . . . It does not involve a use of the mails.
 
 
 36
 Id. at 621.
 
 
 37
 As with Johnson, Congress effectively overturned Ross. Tellingly, however, it did so not by purporting to make the crime of "deposit[ing]" mail triable in any district through which such mail passed, but instead by changing the substantive offense covered by the statute to "us[ing]" the mails. See 18 U.S.C. § 1461 (providing, in part, that anyone who "knowingly uses the mails for the mailing, carriage in the mails, or delivery of anything declared by this section . . . to be nonmailable" is subject to punishment); Wright, supra, § 302, at 197. Congress has, of course, made no such change to the mail fraud statute. Absent such legislative action, we can see no reason to impose the same result by way of the expansive statutory interpretation urged upon us by the government in this case.[7]
 
 
 38
 Indeed, although we need not rest our decision on this basis, we note that it is arguable that if § 3237(a) did apply to the mail fraud statute as currently written, it might to that extent be unconstitutional. The Wright & Miller treatise observes that, based on the Sixth Amendment, "Congress lacks the power to provide for trial in a district other than that in which the crime was committed." Wright, supra, § 302, at 201; see also Cores, 356 U.S. at 407 ("The Constitution makes it clear that determination of proper venue in a criminal case requires determination of where the crime was committed."). According to the treatise, this restriction is easily circumvented by Congress because "[b]y altering a verb in a statute it may alter the nature of the offense, and thus the proper venue, or it may proscribe some additional offense related to the principal offense." Wright, supra, § 302, at 201. However, we need not address the issue of the limits on Congress's power to so redefine crimes. As noted above, Congress has not altered the defining verbs in § 1341. As a result, there is a strong argument that, for constitutional venue purposes, the locus of the crime of mail fraud does not include districts through which mailings merely passed en route to their destination, cf. United States v. Reed, 773 F.2d 477, 479-82 (2d Cir. 1985)(identifying various factors as relevant in determining the "locus of a crime" for venue purposes), and that any attempt to lay venue in those districts while not altering the substantive offense would be invalid.
 
 
 39
 In any event, we conclude that this problem is hypothetical. To embrace the interpretation of §§ 1341 and 3237(a) urged by the government would be to reach a result that the statutory language does not command and that the policies of the Constitution counsel against. We decline to do so, and conclude that venue was not proper in the Eastern District.
 
 
 40
 B. Was the error harmless?
 
 
 41
 The government maintains that, even if venue was not properly laid in the Eastern District, the error was nevertheless harmless and the indictment and conviction may stand. See Fed. R. Crim. P. 52(a)("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."). In support of this argument, the government points to the close geographic proximity of the Eastern District courthouse in Brooklyn to the Southern District courthouse in lower Manhattan. Because venue concededly would have been proper at the latter, it argues, indictment and trial at the former did not impose a substantial hardship on defendants. But see United States v. Rodriguez, 465 F.2d 5, 10-11 (2d Cir. 1972) (reversing conviction on ground that erroneous instruction based on § 3237 allowed jury to find venue proper in Southern District; venue would have been proper in Eastern District); United States v. Bozza, 365 F.2d 206, 220-22 (2d Cir. 1966)(Friendly, J.) (reversing convictions and dismissing counts of indictment on ground that venue was improper in Eastern District, despite fact that venue would have been proper in Southern District); United States v. Zeuli, 137 F.2d 845, 847 (2d Cir. 1943)(L. Hand, J.) (reversing conviction and dismissing indictment on ground, inter alia, of improper venue where "[t]he substantive crime was committed altogether in Manhattan and the prosecution was in Brooklyn.").
 
 
 42
 We disagree that the error was harmless. Defendants clearly objected to venue, moving prior to trial to dismiss the indictment for lack of venue on the ground that § 3237(a) does not apply to the mail fraud statute. The government opposed the motion and the district court ruled in its favor, telling the defendants to "pursue any arguments on a legal ground concerning the statutory interpretation with the Court of Appeals if it becomes necessary."[8] As we concluded above, defendants were entitled to what they sought: prosecution in a lawful venue. Although we do not suggest that venue error can never be harmless, we conclude that in the circumstances of this case -- especially given that venue was predicated on an erroneous statutory interpretation, to which the defendants expressly and timely objected -- it was not. Accordingly, reversal of the conviction and dismissal of the indictment is required.
 
 II. Other considerations
 
 43
 Given our conclusion that venue was improper in the Eastern District, we need not address defendants' other arguments for reversal. However, in view of the possibility that a United States Attorney in a district where venue could properly be laid may consider undertaking a new prosecution, we observe that the case against defendants appears seriously problematic in several respects. We note three.
 
 
 44
 First, defendants contend that insofar as the prosecution was based on the existence of fiduciary duties between defendants and the reinsurers, coinsurers, and USAir, it violated the rule of lenity and the requirement of fair notice implicit in the concept of due process. See United States v. Lanier, 520 U.S. 259, 266, 117 S. Ct. 1219, 1225 (1997) ("[T]he canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered."); id. ("[D]ue process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope"); McNally v. United States, 483 U.S. 350, 359-60 (1987) (adopting narrow construction of the current version of § 1341); United States v. Chestman, 947 F.2d 551, 569-70 (2d Cir. 1991)(en banc); United States v. Tannenbaum, 934 F.2d 8, 11 (2d Cir. 1991). The government has pointed to no precedent for criminal liability based on nondisclosures to sophisticated corporations in arms-length contractual insurance relationships, in circumstances like those presented here. Indeed, there was substantial reason for one in defendants' position to conclude that the relationships at issue were not fiduciary under New York law or otherwise. See, e.g., Continental Cas. Co. v. Stronghold Ins. Co., 77 F.3d 16, 21 (2d Cir. 1996) ("[I]t has been said that the relationship between a reinsured and its reinsurer is not technically a fiduciary one."); Unigard Security Ins. Co. v. North River Ins. Co., 4 F.3d 1049, 1066, 1069 (2d Cir. 1993) (describing duty between reinsurer and reinsured as one of good faith); Christiana General Ins. Corp. v. Great American Ins. Co., 979 F.2d 268, 280-81 (2d Cir. 1992) ("[B]ecause these contracts [between reinsureds and reinsurers] are usually negotiated at arms length by experienced insurance companies, there is no reason to label the relationship as "fiduciary.'") (citation omitted); Pavia v. State Farm Mut. Auto Ins. Co., 82 N.Y.2d 445, 452 (1993) (describing duty of insurer "in defending and settling claims over which it exercises exclusive control on behalf of its insured" as one of "good faith"); Uhlman v. New York Life Ins. Co., 109 N.Y. 421, 429 (1888) (finding that insurer did not serve "in a fiduciary capacity" toward its insured "and that the relation between the policy-holder and the company was one of contract, measured by the terms of the policy"). Compare N.Y. Ins. Law § 2120 (imposing fiduciary duties on insurance agents, insurance brokers, and reinsurance intermediaries with respect to funds received from clients). Even if these civil cases would be distinguishable from the facts presented here, they substantially undercut the notion that defendants had fair notice that nondisclosures regarding reinsurance arrangements and the facts surrounding the Flight 1771 litigation could constitute a crime under the federal mail fraud statute.
 
 
 45
 Second, there is strong reason to think the district court's instruction to the jury on the nature of fiduciary duties was flawed. Over defendants' objection, the court broadly instructed the jury that
 
 
 46
 a fiduciary duty is one founded upon trust and confidence or reposed by one party in the integrity and fidelity of another. The relationship exists where one party trusts in and relies upon another party to act in both of their interests and to their mutual benefit, and the other party relied upon knows and intends that the first party trust and rely upon him to act in both of their interests.
 
 
 47
 In contrast, we have emphasized that "[a] fiduciary relationship involves discretionary authority and dependency" and that "at the heart of the fiduciary relationship lies reliance, and de facto control and dominance. The relation exists when confidence is reposed on one side and there is resulting superiority and influence on the other. . . ." Chestman, 947 F.2d at 568, 569 (quotation marks and citations omitted; emphasis added). We think the elements of domination or control are of particular importance in a case like this one, where all parties to the various contractual relationships were concededly sophisticated companies with experience in the industry, and where the alleged victims had a variety of practical and contractual rights to participate in or challenge defendants' decisions.
 
 
 48
 Finally, we have some question whether there was sufficient evidence to support the government's alternative theory, i.e., that defendants made affirmative misrepresentations to USAir, the reinsurers, and the coinsurers. See United States v. Brown, 79 F.3d 1550, 1559 (11th Cir. 1996) ("A 'scheme to defraud' under the [mail fraud] statute[] has not been proved where a reasonable juror would have to conclude that the representation is about something which the [alleged victim] should, and could, easily confirm -- if they wished to do so -- from readily available external sources.").
 
 
 49
 We do not decide these issues. However, in the event a United States Attorney should contemplate initiating a new prosecution, careful attention should be given to each of these points because they would give rise to serious questions on a future appeal.
 
 CONCLUSION
 
 50
 The judgments of conviction are reversed and the indictment dismissed without prejudice.
 
 
 
 Notes:
 
 
 *
 The Honorable Leonard D. Wexler, United States District Judge for the Eastern District of New York, sitting by designation.
 
 
 [1]
 During the trial, USAU unsuccessfully sought contribution to the settlements from the lead insurer for LAX.
 
 
 [2]
 The district court charged the jury that the fact that USAU acted as lead insurer for both USAir and Ogden was not an impermissible conflict of interest and non-disclosure of that fact would not alone support a conviction. The court also stated that "failure to disclose a dual lead . . . is not a material non-disclosure since it is something easily determined and verified which it would be unreasonable to require someone to disclose."
 
 
 [3]
 More specifically, it appears that USAIG was responsible for 75 percent of the first $10 million of Ogden's "war risk" liability -- a category that included losses resulting from criminal acts such as Burke's -- but was fully reinsured for liability above $10 million.
 
 
 [4]
 The district court charged the jury that "[t]he prosecution needn't prove that the mailing[s] occurred in this District in the sense that the mail was deposited into the hands of a postman or into a post box in this District, or that the defendant himself or itself was present in the District, provided it is shown that any act in furtherance of the crime occurred within the District, referring in particular to the passage of the mail in the regular course of delivery by the United States Postal Service through one of the counties in the District."
 
 
 [5]
 Read literally, this clause of the Sixth Amendment is not a venue provision but rather a "vicinage provision, since it deals with the place from which the jurors are to be selected." 2 Charles Alan Wright, Federal Practice and Procedure: Criminal 2d § 301, at 190 (1982). Compare U.S. Const. art III, § 2, cl.3 ("The Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed. . . ."). The distinction between venue and vicinage, "however, has never been given any weight, . . . perhaps . . . because the requirement that the jury be chosen from the state and district where the crime was committed presupposes that the jury will sit where it is chosen." United States v. Passodelis, 615 F.2d 975, 977 n.3 (3d Cir. 1980).
 
 
 [6]
 It is true that in United States v. Cashin, 281 F.2d 669, 674 (2d Cir. 1960), a panel of this court suggested that venue for mail fraud prosecutions is proper in districts through which mailings passed. However, this passage was clearly dictum: Cashin involved a prosecution for securities fraud under Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and held that venue was proper in the district in which the fraudulent scheme was formed and in large part executed, despite the fact that no mailings were sent or received there. Moreover, the cases cited by Cashin in support of its mail fraud dictum do not hold that venue is proper in any district through which mailings passed. See Hagner v. United States, 285 U.S. 427, 429-31, 52 S. Ct. 417, 418-19 (1932)(indictment sufficient in district to which mail is addressed); Salinger v. Loisel, 265 U.S. 224, 234, 44 S. Ct. 519, 522-23 (1924)(venue proper in district in which mail is delivered).
 
 
 [7]
 We note that the Department of Justice has itself reached this same conclusion and rejected the position advanced by the U.S. Attorney in this case, i.e., that mail fraud prosecutions may be had in any district through which mailings passed. "The locus of the offense under 18 U.S.C. § 1341 has been carefully specified; and only the acts of 'placing', 'taking' and 'causing to be delivered' at a specified place have been penalized. Venue, therefore, should be placed accor[ding] to the specific prohibitions of 18 U.S.C. § 1341, irrespective of 18 U.S.C. § 3237(a)." Department of Justice Manual, Title 9, Chapter 43, § 9-43.300, at 9-1148 (1984 & 1989-2 Supp.).
 
 
 [8]
 The district court adhered to its ruling in a post-trial Memorandum and Order, stating that "defendants' position is contrary to the weight of authority in this circuit."