**UNITED STATES of America,**

v.

**Juan Manuel ORTIZ, also known as "Juan Manuel Ortiz–Alevar", Defendant.**

**No. CR–94–389 (S–5)(DGT).**

United States District Court, E.D. New York.

Nov. 21, 1995.

---

United States Attorney, Eastern District of New York, Brooklyn, NY, for Plaintiff.

Canton & Jasper, New York City, for Defendant.

*OPINION*

TRAGER, District Judge:

At sentencing, the court had before it the Rule 29 motion of defendant, Juan Manuel Ortiz, requesting a dismissal of Counts Five through Thirteen and Fourteen of the indictment—as submitted to the jury—alleging acts which caused false entries to be made in bank records in violation of 18 U.S.C. § 1005.

The motion was granted. This opinion sets forth the reasons for the court's determination.

**Background**

On June 28, 1995, the defendant, Juan Manuel Ortiz, was convicted, after a jury trial, of eighteen counts of money laundering, drug trafficking, structuring financial transactions and causing false entries into bank records.

The defendant objects to the counts in the indictment relating to 18 U.S.C. § 1005. Specifically, Counts Five through Thirteen charged that the defendant:

> did knowingly and willfully cause false entries to be made in books, reports and statements of insured banks, as set forth below, with *intent to injure and defraud such banks* ... 18 U.S.C. §§ 1005, 2b, and 3551. (emphasis added).

Count Fourteen charged that the defendant:

> did knowingly and willfully engage and attempt to engage in monetary transactions in criminally derived property of a value greater than $10,000, to wit: the deposit of fraudulently obtained replacement money orders, which property was derived from a specified unlawful activity, to wit: causing false entries in bank records, in violation of [18 U.S.C. § 1005]. (citing 18 U.S.C. §§ 1957, 3551).

The counts in question are all based on the same provisions of 18 U.S.C. § 1005 which, in relevant part, states:

> Whoever makes any false entry in any such book, report or statement of such bank ... *with intent to injure or defraud such bank ... or to deceive any officer of such bank, ... or the Comptroller of the Currency,* or the Federal Deposit Insurance Corporation, ... shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both. (emphasis added).

An expert in money laundering, Special Agent Don Semesky, defined money laundering as: "a term that is given to the various financial transactions that are designed to accomplish the concealment of funds that are

earned illegally, and also, to give those funds the appearance of coming from a legitimate source." Tr. at 42. He explained the money launderer's role as: "hav[ing] to take that money from the [drug] trafficker, convert it to [a] more easily concealable and transportable form, such as, money order, bank check, cashier's check, or to get that money—that currency into the banking system at which point it can be transferred through wire transfers service to anywhere in the world within a matter of seconds." Tr. at 43.

Money laundering is a three step process, according to Semesky, in which completing any portion constitutes the crime. The first step is placing the currency into the banking system, generally through a deposit or bank check or money orders. Second, the individual "layers" a number of transactions so that the original source of the money becomes unknown. Tr. at 44. Generally, the individuals involved in layering are known as "smurfs" because "their jobs are to go to bank to bank to bank or wherever and buy the money orders or cashier check." Tr. at 83. The third step in the process is the actual spending of the money by the owner.

The primary method to complete step one without having the authorities notified, due to detailed banking regulations in which federal authorities are alerted to any deposits or requests for money orders, cashier's checks, etcetera of $10,000 or more is through "structuring," "simply purchasing the cashier's checks or money orders or making deposits under $10,000 or as it relates to monetary instruments which are the money orders or cashier's check under $3,000.[1] Tr. at 57. The money orders are then, often, "block smuggl[ed] through express mail packages out of the country." Tr. at 62. Semesky further explained that individuals engaged in the laundering of drug proceeds are responsible for the drug money from the time they receive it until it safely arrives in Colombia. Tr. at 86.

At trial, three of the prosecution witnesses testified that the defendant hired them to go to various banks and complete replacement requests. The witnesses explained that after being told by Ortiz "that this was [Ortiz's] money; that [what Ortiz was asking these "smurfs" to do was not illegal], but [Ortiz] just couldn't claim all the money at once, to do [Ortiz] the favor of going in and saying it's [their] money," Tr. at 873, they falsely swore that they were the original purchasers of the money order, and that the original had been lost or stolen. Testimony of Vega, Tr. at 930; Testimony of Merchan, Tr. at 873–74; Testimony of Cepeda, Tr. at 1012–13. Further, Ms. Merchan explained that she signed in the line, saying: "must sign here, sign as purchaser, payee or endorser," because although she was not the purchaser, payee, or endorser, Ortiz told her to sign on that line. Tr. at 874.

Bank employees also testified that these individuals, had submitted false affidavits or bank forms claiming that they were the true purchasers of the original money orders. Testimony of Cordova, Tr. at 746; Testimony of Funk, Tr. at 762. And, in many instances, based on the banks' acceptance of these false affidavits replacement checks were issued. Testimony of Hahn, Tr. at 823–24; Testimony of Worrell, Tr. at 682; Testimony of Cepeda, Tr. at 1014–15. These checks were then delivered to the defendant, who either cashed them or deposited them into his account. Testimony of Halbig, Tr. at 1158–66.

The need to replace these money orders arose from the seizure by the U.S. Postal Service of hundreds of thousands of dollars of money orders, all of which were purchased in a structured fashion and sent to Colombia in three express mail packages. Tr. at 483–95. Consequently, as the head of the money laundering division of the cartel, Ortiz was responsible for replacing the seized money orders.

Special Agent Semesky testified that bank employees are required by administrative rules and the Treasury to report any suspicious transactions. Tr. at 115. Pursuant to 12 C.F.R. § 21.11, all financial institutions .conducting banking business in the United States are *required* by the Comptroller of

---

1.  On any transaction in which a financial institution that exceeds $3,000 in currency, the financial institutions must obtain identification information from the purchaser and record such information in a log along with a description of the transaction.

Currency, to submit a Criminal Referral Form when the institution suspects that a transaction conducted at the bank can be characterized as money laundering. Section 21.11 of the C.F.R. was promulgated to insure that banks establish and maintain procedures designed to monitor their compliance with the record keeping and reporting requirements. The section contains mandatory language requiring the filing of a Criminal Referral Form:

> in case of any known or suspected criminal violation, or pattern of criminal violations, of any section of the United States Code, when the bank was used to facilitate a criminal transaction, whether or not the bank has a substantial basis for identifying a suspect or group of suspects.... [W]illful failure to file or careless disregard in filing reports may subject the bank, its officers, and/or its directors, to civil money penalties.

Banks need to provide detailed information relating to the person suspected of the criminal activity in Criminal Referral Forms. The banks must identify the name, address, and if possible, the date of birth and social security number of the suspect, describe the suspect's relationship with the financial institution, and provide a brief description of the suspected criminal activity. There are similar regulations requiring state banks, credit unions and insured non-member banks to file Criminal Referral Forms. 12 C.F.R. §§ 208.20; 353.1; 748.1. The statutes and regulations in no way mandate the banks to inform customers of the bank's requirements to report transactions over $10,000 in cash. Tr. at 113.

According to the Government, by using and causing others to submit false affidavits, the defendant "deceive[d] the bank by shielding the defendant's name and identity from association with structured transactions." Govt.'s Memo. in Response to Def.'s Rule 29 Motion at 3. Furthermore, "[h]ad Ortiz made all of the replacement requests in his own name, he would have brought upon himself the very scrutiny he sought to avoid by structuring the purchases of the original money orders—the scrutiny of the government." *Id.*

It is undisputed that none of the banks suffered a financial loss as a result of the replacement money order requests. Each of the banks mentioned in the indictment, pursuant to the federal regulations, has adopted procedures for handling requests for replacement money orders. Generally, once a replacement request is made to the bank, a "stop payment order" is placed on the original money order. Then, the banks wait a determined period of time before issuing a replacement to ensure that the original money order had not been cashed. If during that period the original was cashed, then the banks refuse to issue a replacement; however, if it was not cashed, then the banks stop the original order so that it could not be collected upon and issue the replacement. *See* Tr. at 530.

## Discussion

### (1)

■ Ortiz's first argument is that the Government, in almost all instances, did not prove the identity of the original purchaser of the money orders and, thus, did not prove that the replacement requests constituted false statements.

The Government correctly responds that the identity of the true purchasers is irrelevant because in each count charged in the indictment, the person making the request testified that he or she was not the original purchaser, and thus the request was false. Examples of these are the testimonies of Vega, Tr. at 930, Merchan, Tr. at 876, and Cepeda, Tr. at 1012–13.

### (2)

■ Ortiz's second, and more significant, argument relates to whether Ortiz's actions constitute a violation of 18 U.S.C. § 1005. The Government contends that the Comptroller of the Currency has issued policies and procedures which govern the imposition of civil money penalties pursuant to 12 C.F.R. § 21.11(h). Thus, the Government concludes, "it is clear that, by causing false entries into bank records, Ortiz deceived the banks, and as a result, the Comptroller of the Currency. The banks could not file the required Criminal Referral Forms because they were deprived of the information they

needed to file those forms. Ortiz acted intentionally to hide his identity from the banks, and therefore, from the Government. Ortiz's actions clearly amount to an intent to deceive or defraud as required pursuant to 18 U.S.C. § 1005." Govt.'s Memo. in Response to Def.'s Rule 29 Motion at 5. Accordingly, the Government contends that Ortiz's actions constituted both deceit and fraud under § 1005 of the banks and the Comptroller of Currency.

The defendant claims that the Government failed to prove that he violated or conspired to violate 18 U.S.C. § 1005 because no evidence was introduced to demonstrate that the defendant possessed the intent to injure and defraud the banks. The banks did not suffer a financial loss as a result of the replacement money order requests, and whether or not a loss is necessary, the defendant alleges that the Government did not produce proof that the defendant had the specific intent to injure and defraud the banks. Moreover, no evidence was set forth "that Ortiz was in a position to cause a false entry into the financial institution's books to be made." Def.'s Sent.Memo. at 3.

The defendant argues that the Government's case attempts to make an omission equivalent to a commission of the offense— allegedly by causing the bank to fail to file a report, Ortiz has achieved the factual equivalent of causing the bank to make a false entry. However, Ortiz maintains that "the plain language of the statute calls for the commission of an act, not for the omission." Def.'s Sent.Memo. at 2.

Although Ortiz's brief is less than clear, his basic assertion has been upheld in other courts. Most relevant is the Third Circuit's holding in *United States v. Barel*, 939 F.2d 26 (3d Cir.1991), which found that § 1005 does not apply to bank customers who, acting in their own personal interest, gave false information to the bank. In *Barel*, the defendant opened a number of bank accounts with a false social security number in order to evade paying child support, thereby, deceiving the United States. He was convicted of false entry charges in violation of § 1005 and § 2. In reversing the conviction and dismissing the indictment, the Third Circuit

reasoned that while the precise language of the statute does not preclude application to bank customers, the legislative history convinced the court "that this is an appropriate case for applying the ancient maxim that criminal statutes should be narrowly construed." *Id.* at 39. Further, the court explained that § 1005 is based on 12 U.S.C. §§ 592, 597 (1940) which clearly "applied only to officers, directors, agents, or employees of the protected banks." *Id.* The Reviser's Note to § 1005 explains that "no changes of meaning or substance were made except that ... the different punishment provisions were reconciled, and one uniform punishment provision was adopted." 18 U.S.C.A. § 1005, "Historical and Revision Notes."

The Third Circuit also found that Barel lacked any specific intent to violate federal law. "His acts causing bank employees to make false entries in the bank's books, although intentional in the general sense of the word, were merely a byproduct of his specific intent to defraud his wife." *Id.* at 42. Consequently, the court did not find Barel liable under § 2 either.

Similarly, in an old Supreme Court case, relying on the predecessor to § 1005, the Court held: "The crime of making false entries *by an officer* of a national bank with an intent to defraud ... includes any entry on the books of the bank which is intentionally made to represent what is not true or does not exist, with the intent either to deceive its officers or to defraud the association." *Agnew v. United States*, 165 U.S. 36, 52, 17 S.Ct. 235, 241, 41 L.Ed. 624 (1897) (emphasis added).

And, lastly, in a Connecticut district court opinion, the court found that only employees, agents, officers and directors of banks acting in connection with their role as bank employees can violate § 1005. In particular, the court reasoned that a bank teller who deposited checks into her account, knowing that there were insufficient funds to support the checks, was not liable under § 1005 "[h]aving considered the statute at issue here, as well as the pre–1948 criminal code revision predecessor statute, 12 U.S.C. §§ 592, 597 (1940), the relevant case law, the indictment and bill of particulars in this case, and Justice Black-

mun's analysis in *Williams v. United States,* 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982), of a related statute, 18 U.S.C. § 1014, the Court concludes the indictment must be dismissed." Although not apparent from the terms of § 1005, the legislative history and the pre–1948 bill make clear that the statute only reaches to conduct performed by individuals acting in their capacity as bank officials or aiding and abetting such persons. *United States v. Edwards,* 566 F.Supp. 1219, 1220–21 (D.Conn.1983).

The only case which appears to convict a customer of a bank who was not a bank officer or employee under § 1005 convicted the customer along with several of the bank's executives of defrauding the bank of more than $750,000 through a scheme involving the cashing of overdrafts. *United States v. Austin,* 585 F.2d 1271, 1272 (5th Cir.1978). Austin wrote the checks and his co-defendants, the employees of the bank, approved them for cashing. Although the Fifth Circuit affirmed the district court's holding without reference to the distinction between customer and insider, it must be recognized that Austin was in fact an aider and abettor and thus need not · commit the overt act that accomplished the offense or have knowledge of the particular means his principals employed to carry out the criminal activity in order to be charged with the underlying crime. Of course, here, Ortiz was the princi-

pal actor and not the aider or abettor, in these money order transactions.

While no other cases could be found which discuss the necessity of the defendant to be an employee or agent of the bank in order to convict under § 1005, there are many cases which find bank employees or trustees or officers guilty, but none that find general customers guilty.[2] At Ortiz's trial, the Government particularly relied upon *United States v. Castro,* 887 F.2d 988 (9th Cir.1989) when persuading this court that the § 1005 charges should be allowed to go to the jury. In *Castro,* the Ninth Circuit affirmed the conviction under § 1005 of a vice-president of the bank who approved loan applications containing information that he knew was incorrect, thereby misapplying bank funds and falsifying bank records. The Assistant United States Attorney in making her argument to the court first quoted from the case: "Bank funds are misapplied when they are disbursed under a record containing misrepresentations of fact with intent to deceive officials or bank examiners intent to injure need not be shown if there's intent to deceive or defraud." 887 F.2d at 995. She attempted to point out the relevance of this case, stating: "Deceive. Is the bank not being deceived when it is being told that the purchaser of these money orders was not the defendant?" Tr. at 1316–17. However, upon further reflection, it appears that the Assis-

**2.** *See e.g. United States v. Paul Gallerani,* 68 F.3d 611 (2d Cir.1995) (upholding conviction of senior officers of bank holding company and subsidiary banks who falsified bank documents to hide undisclosed financial interests of the officers in order to obstruct federal bank examiners violated § 1005); *United States v. Campbell,* 64 F.3d 967 (5th Cir.1995) (finding that the president of a corporation who also was the chairman of the board of directors of the bank who knowingly lied in his application for a mortgage was liable under § 1005 for intending to defraud the bank); *United States v. McCord,* 33 F.3d 1434 (5th Cir. 1994), *cert. denied, Haley v. United States,* —— U.S. ——, 115 S.Ct. 2558, 132 L.Ed.2d 812 (1995) (convicting under § 1005 trustees in a bank employee stock ownership plan for having material omissions in records); *United States v. Chaney,* 964 F.2d 437 (5th Cir.1992) (upholding convictions of the president of the bank who made false entries in her bank's books and records while involved in sham loan making and thus violated § 1005); *United States v. Kington,* 875 F.2d 1091 (5th Cir.1989) (upholding convic-

tions of bank president and vice-president for misapplying bank funds and making false entries in bank records, thereby causing a bank to fail to file Currency Transaction Reports required by § 1005); *United States v. McCright,* 821 F.2d 226, 232 (5th Cir.1987), *cert. denied,* 484 U.S. 1005, 108 S.Ct. 697, 98 L.Ed.2d 649 (1988) (upholding a conviction under § 1005 of a vice-president of a bank who actually resigned before the improper loan application was signed which defendant claimed "thus remov[ed] him from the scope of section 1005" finding that conviction was correct because while he was a bank executive, the false records were made); *United States v. McGuire,* 744 F.2d 1197 (6th Cir.1984), *cert. denied,* 471 U.S. 1004, 105 S.Ct. 1004, 85 L.Ed.2d 159 (1985) (upholding convictions of a bank president and a mortgage loan officer finding they made false entries in bank's records); *United States v. Jackson,* 621 F.2d 216 (5th Cir. 1980) (finding the bank president who made false entries in the bank's books regarding loans to a corporation was liable under § 1005).

tant—as well as the court—overlooked the crucial fact that the defendant in *Castro* was a bank officer not a bank customer.

Furthermore, the Second Circuit in *United States v. Docherty*, 468 F.2d 989 (2d Cir. 1972), rejected the district court's application of § 1005 to a case in which the vice-president of the bank embezzled money by having his friends take out loans for him and reversed the conviction. The defendant would ask his friends to take out loans in their names and give him the money explaining that bank policy prohibited his borrowing from the bank and frowned upon his borrowing from other banks as well. This lie to innocent aiders who had no knowledge of the criminal intent of the defendant is identical to Ortiz, except for the fact that the defendant in *Docherty* was a vice-president of the bank while Ortiz was just a customer. This distinction, as previously described, takes Ortiz out of the scope of § 1005. Interestingly, in *Docherty*, the court went on to recognize that the transactions involved did not provide an "intent to injure" the bank because the defendant was "putting his own credit on the line, and it was not suggested that he lacked the means to repay." *Id.* at 995. "As to defrauding, even if we assume arguendo that failure to disclose the true recipient of the proceeds was a misrepresentation, the case lacks the element of foreseeability of damages essential even for a civil suit." *Id.* Here, applying these principles, Ortiz did not intend to defraud or injure the bank, because the money orders were not replaced with duplicates until the original orders were canceled, thus, the bank was never in danger of losing money. Consequently, not only was Ortiz, being a bank customer instead of a bank employee or officer, outside of the ambit of the statute.[3]

### Conclusion

Accordingly, for the reasons provided, Ortiz's motion pursuant to Fed.R.Crim.Proc. 29 to dismiss Counts Five through Fourteen of

the indictment as charged to the jury was granted.

---

3. In its responsive papers, the Government proffered an alternative argument to sustain these charges, namely that Ortiz was guilty of "intent to deceive the Comptroller of the Currency." Govt.'s Memo. in Response to Def.'s Rule 29 Motion at 3. Assuming that § 1005 could apply to a bank customer who is not aiding or abetting a bank official, "intent to deceive the Comptroller of the Currency" was not the charge here. Thus, additional questions would be raised as to whether such an approach would constructively amend the indictment and, if it did not, whether the evidence was sufficient to support this theory.