**UNITED STATES of America,**

v.

**RUBIN/CHAMBERS, DUNHILL INSURANCE SERVICES, et al., Defendants.**

**No. 09 Cr. 1058.**

United States District Court, S.D. New York.

July 20, 2011.

Rebecca Meiklejohn, Steven Tugander, Kevin Bradford Hart, U.S. Dept. of Justice, New York, NY, Lucy Pepe McClain, Philadelphia, PA, for United States of America.

Bradley Drew Simon, Adam Stewart Katz, Brian David Waller, Simon & Partners LLP, John Joseph Kenney, Laura B. Hoguet, Hoguet Newman Regal & Kenney, LLP, Juan Alden Skirrow, Willkie Farr & Gallagher LLP, Michael Gerard McGovern, Steven S. Goldschmidt, Ropes & Gray, LLP, Daniel Louis Zelenko, Shamiso Kristen–Faith Maswoswe, Crowell & Moring LLP, New York, NY, Donald Etra, Donald Etra, Law Office, Los Angeles, CA, Richard William Beckler, Howrey LLP, Washington, DC, Jeffrey H. Rutherford, Crowell & Moring LLP, San Francisco, CA, for Defendants.

## DECISION AND ORDER

VICTOR MARRERO, District Judge.

Defendants Rubin/Chambers, Dunhill Insurance Services, Inc. ("CDR"); David Rubin ("Rubin"); Zevi Wolmark a/k/a Stewart Wolmark ("Wolmark"); and Evan Andrew Zarefsky ("Zarefsky") (collectively, "Defendants") were indicted on October 29, 2009 and charged with crimes arising out of an alleged conspiracy by Defendants and others to illegally rig bids, fix prices and manipulate the market for investment instruments known as municipal derivatives. On December 7, 2010, the Government filed a superseding indictment (the "Indictment") alleging nine counts in total. All Defendants were charged as follows in the first six counts: Count One alleges conspiracy to restrain trade, in violation of 15 U.S.C. § 1; Count Two alleges conspiracy to violate 18 U.S.C. §§ 1343, 1346 and 1005 (respectively, "§ 1343", "§ 1346" and "§ 1005"), in violation of 18 U.S.C. § 371; Count Three alleges conspiracy to violate §§ 1343 and 1346, in violation of 18 U.S.C. § 371; and Counts Four through Six allege wire fraud, in violation of §§ 1343 and 1346. Further, Count Seven charges Zarefsky alone with one count of making false statements, in violation of 18 U.S.C. § 1001 ("§ 1001"); Count Eight charges Rubin, Wolmark and Zarefsky with interfering with the administration of internal revenue laws, in violation of 26 U.S.C. § 7212(a); and Count Nine charges Rubin alone with making fraudulent bank transactions, in violation of § 1005. In addition, Counts Two through Six contain language charging Defendants with a version of honest services fraud (the "Honest Services Allegations"), in violation of § 1346.

Defendants now move, jointly and separately, pursuant to Federal Rules of Criminal Procedure 12(b) ("Rule 12(b)") and 7(d) to dismiss or strike certain parts of the Indictment. Specifically, Defendants move jointly for an order dismissing Counts Two through Six to the extent the Honest Services Allegations contained therein are based on "the concealment of material information," or, in the alternative, striking the language "the concealment of material information" from the Honest Services Allegations as surplusage (the "Joint Motion"). Defendants also move jointly (1) to dismiss Count Nine, which charges Rubin individually with violating § 1005; and (2) to strike those portions of Count Two that charge Defendants with violating § 1005 (together, the "§ 1005 Motion"). Lastly, Zarefsky moves individually to dismiss Count Seven for improper venue ("Zarefsky's Motion").

For the reasons discussed below, the Court DENIES the Joint Motion, GRANTS the § 1005 Motion and DENIES Zarefsky's Motion.

## I. BACKGROUND [1]

Corporate defendant CDR marketed financial products and services, and served as a broker between municipalities ("issuers"), on the one hand, and various banks ("providers"), on the other. Rubin served as CDR's founder and Chief Executive, Wolmark was CDR's Chief Financial Officer and Zarefsky was a Vice President of CDR. In its role as a broker, CDR assisted its municipal issuer clients with investing the proceeds of municipal bond issues in investment agreements offered by major financial institution providers. Issuers hire brokers like CDR to act as their agents in conducting the competitive bidding procedures through which those issuers select providers. The broker's fee for conducting such an auction is generally paid by the winning provider, who takes the fee into account when calculating its bid and discloses the fee to the issuer.

The Indictment alleges that from 1998 until at least November 2006, the Defendants conspired with certain providers to circumvent the competitive bidding process by controlling and manipulating auctions in order to maximize profits for both CDR and the co-conspirator providers. According to the Indictment, this manipulation artificially determined and suppressed price levels at the expense of the issuers, and sometimes the federal treasury. Specifically, the Indictment alleges that CDR and its coconspirator providers: agreed among themselves which provider

would win a particular auction and at what price; submitted intentionally losing "courtesy" bids in order to make auctions appear competitive, with the understanding that a losing provider would be allocated other business in the future; and permitted co-conspiring providers "last looks" in the auctions, i.e., information about prices, price levels and conditions about other providers' bids to use in determining their own bids. Finally, the Indictment alleges that Defendants falsely certified that the auctions complied with relevant federal regulations and were otherwise competitive. In exchange for its role in manipulating the bidding process in this way, the Indictment alleges that CDR received kickbacks from favored providers that were not disclosed to the issuers or government regulators.

On November 15, 2006, as part of an ongoing investigation conducted by the United States Department of Justice's Antitrust Division ("Antitrust Division"), agents of the Internal Revenue Service ("IRS") and the Federal Bureau of Investigation ("FBI") executed a search warrant at CDR's office in Beverly Hills, California and served the company with a subpoena issued by a Southern District of New York grand jury. At or about the time that this search was occurring, two Manhattan-based federal agents interviewed Zarefsky at a coffee shop near CDR's office in Beverly Hills. During that interview, Zarefsky told the agents that he did not give "last looks" to providers, nor did he have any first-hand knowledge with respect to "last looks" or "courtesy bids." The Indictment alleges these statements Zaref-

---

1. The following factual summary is derived from the Indictment (Docket No. 67); the Declaration of Daniel L. Zelenko dated May 9, 2011 in support of Defendant Evan Zarefsky's Motion to Dismiss Count Seven for Improper Venue and exhibits attached thereto (Docket No. 128); and the Government's Memorandum of Law in Opposition to Defendants' Motions to Dismiss and to Strike (Docket No. 135). Except where otherwise noted, no further reference to these sources will be made.

sky made to the federal agents were false. The statements were recorded as handwritten notes at the time of the interview and then further memorialized nine days later in a report prepared in the Southern District of New York once the agents had returned from California. The report was then provided to the Antitrust Division in its New York office.

## II. DISCUSSION

### A. *LEGAL STANDARD*

■ "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). On a pretrial motion to dismiss pursuant to Rule 12(b), the Court accepts the allegations in the indictment as true, *see United States v. Goldberg,* 756 F.2d 949, 950 (2d Cir.1985), and focuses on the legal sufficiency of the indictment itself, without ruling on the legal sufficiency of the evidence or contrary assertions of fact. *See United States v. Alfonso,* 143 F.3d 772, 776–77 (2d Cir. 1998). "An indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Tramunti,* 513 F.2d 1087, 1113 (2d Cir.1975). Further, an indictment must be read with "common sense," considering those "facts which are necessarily implied by the specific allegations made." *United States v. Stavroulakis,* 952 F.2d 686, 693 (2d Cir.1992).

"Upon the defendant's motion, the court may strike surplusage from the indictment or information." Fed.R.Crim.P. 7(d). However, "it has long been the policy of courts within the Southern District [of New York] to refrain from tampering with indictments." *United States v. Bin Laden,* 91 F.Supp.2d 600, 621 (S.D.N.Y.2000) (internal quotation marks omitted). As the Court of Appeals for the Second Circuit has cautioned, "motions to strike surplusage from an indictment will be granted only where the challenged allegations are 'not relevant to the crime charged and are inflammatory and prejudicial.'" *United States v. Hernandez,* 85 F.3d 1023, 1030 (2d Cir.1996) (*quoting United States v. Scarpa,* 913 F.2d 993, 1013 (2d Cir.1990)). Where "evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken." *Scarpa,* 913 F.2d at 1013 (internal quotation marks omitted).

■ The government bears the burden of demonstrating, by a preponderance of the evidence, that venue is proper. *See United States v. Ramirez,* 420 F.3d 134, 139 (2d Cir.2005). Evidence as to venue must be viewed in the light most favorable to the government, crediting every inference that might be drawn in its favor. *See id.*

### B. *THE JOINT MOTION*

■ In their Joint Motion, Defendants contend that certain language in the Honest Services Allegations charging them with the "concealment of material information" is unconstitutionally vague in light of the Supreme Court's decision in *Skilling v. United States,* —— U.S. ——, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010). Defendants assert that Counts Two through Six must therefore be dismissed, or, in the alternative, that the offending language should be stricken from the Indictment. The Court disagrees.

The Honest Services Allegations in Counts Two through Six allege, in relevant part,

having devised and intending to devise a scheme and artifice to defraud ... and further to deprive municipal issuers of the intangible right to the honest and faithful services of the CDR Defendants and co-conspirators at CDR *through kickbacks and the concealment of material information,* ... [Defendants] would and did transmit and cause to be transmitted by means of wire, radio or television in interstate or foreign commerce any writings, signs, signals, pictures or sounds, in violation of Title 18. United States Code, Sections 1343 and 1346.

Indictment ¶ 31 (emphasis added); *see also id.* at ¶¶ 45, 58.

Defendants assert that these allegations should be read as setting forth two separate and independent theories of honest services fraud, namely, one based upon the alleged provision of kickbacks and another based upon the alleged concealment of material information. Yet under *Skilling,* the Defendants contend, allegations that a defendant engaged in "schemes of non-disclosure and concealment of material information" are unconstitutionally vague and may not serve as an independent basis for conviction under § 1346.

To the extent that the Honest Services Allegations can be read to allege a single theory of criminal activity encompassing both kickbacks and the concealment of activity related to those kickbacks, however, they are clearly permissible under *Skilling. See* 130 S.Ct. at 2933 ("[I]t has always been plain as a pike staff that bribes and kickbacks constitute honest services fraud."); *United States v. Rybicki,* 354 F.3d 124, 142 (2d Cir.2003) (holding that a scheme to bribe insurance adjusters in order to expedite insurance claims that was "accompanied by material omission[s]" fell squarely within the ambit of § 1346). Read together with the remainder of Counts Two through Six, which deal directly with the structure of the alleged bid rigging and kickbacks scheme and allege that Defendants failed to inform issuers about those kickbacks, the challenged language is easily susceptible to such an interpretation. *See United States v. Seminerio,* No. 08 Cr. 1238, 2010 WL 3341887, at *7 (S.D.N.Y. Aug. 20, 2010) ("While these passages ... undoubtedly charged Seminerio with intentionally concealing a conflict of interest, they at the same time make clear that the concealed conflict was Seminerio's secret solicitation and receipt of *bribes.* Thus the Indictment survives *Skilling* and Seminerio's vagueness challenge fails." (emphasis in original)).

■ An indictment need only "fairly inform[ ] a defendant of the charge against which he must defend," *Hamling,* 418 U.S. at 117, 94 S.Ct. 2887, and, in this regard, the Honest Services Allegations, when read to allege a single theory of kickbacks and their concealment, suffice. Even were the Court to accept Defendants's argument that the "concealment of material information" language is redundant because the term "kickbacks" necessarily entails concealment, surplusage may be stricken from an indictment only where it is irrelevant to the crime charged, inflammatory and prejudicial. *See Hernandez,* 85 F.3d at 1030. Here, the alleged concealment was part and parcel of the alleged kickback scheme and evidence of such concealment could be relevant to proving intent to defraud under § 1346. Further, the language is not inflammatory, and any potential for juror confusion stemming from grammatical ambiguity may be remedied through a proper jury charge. Defendants' Joint Motion is therefore denied.

## C. *THE § 1005 MOTION*

Turning next to the Defendants' § 1005 Motion, the Court finds itself presented with a more involved set of questions.

■ Defendants contend that (1) the entirety of Count Nine, which charges Rubin alone with violating § 1005, must be dismissed, and (2) the portions of Count Two charging Rubin, Zarefsky and Wolmark with violating § 1005 must be stricken. Defendants argue that this result is compelled because § 1005, and the fourth paragraph of § 1005 ("Paragraph Four") in particular, does not apply to individuals who are not bank officers, employees or other bank insiders.

■ The Court is called on therefore to interpret the meaning and scope of Paragraph Four, a question of first impression in this Circuit. Having considered the text of the statute at issue, as well as the legislative history of § 1005's individual paragraphs, and the relevant case law, the Court concludes that Paragraph Four applies only to bank insiders. Since the Indictment does not allege that Rubin, Zarefsky or Wolmark are bank insiders, those portions of the indictment referencing an alleged conspiracy to violate § 1005 must be stricken or dismissed.

> Section 1005, provides, in relevant part: *Whoever, being an officer, director, agent or employee* of any Federal Reserve bank, member bank, depositor institution holding company, national bank, insured bank, branch or agency of a foreign bank, or organization operating under section 25 or section 25(a) of the Federal Reserve Act, without authority from the directors of such bank, branch, agency, or organization or company, issues or puts in circulation any notes of such bank, branch, agency, or organization or company; or
>
> *Whoever*, without such authority, makes, draws, issues, puts forth, or assigns any certificate of deposit, draft, order, bill of exchange, acceptance, note, debenture, bond, or other obligation, or mortgage, judgment or decree; or

> *Whoever* makes any false entry in any book, report, or statement of such bank, company, branch, agency or organization, with intent to injure or defraud such bank, company, branch, agency, or organization, or any other company, body politic or corporate, or any individual person, or to deceive any officer of such bank, company, branch, agency or organization ...; or
>
> *Whoever* with intent to defraud the United States, or any financial institution referred to in this section, participates or shares in or receives (directly or indirectly) any money, profit, property, or benefits through any transaction, loan, commission, contract, or any other act of any such financial institution—
>
> Shall be fined not more than § 1,000,000 or imprisoned not more than 30 years, or both."

18 U.S.C. § 1005 (emphasis added).

At first blush, the text of the statute, and that of Paragraph Four, in particular, appears quite clear: the first paragraph ("Paragraph One") is the only paragraph containing language that specifically limits its application to "officer[s], director[s], agent[s] or employee[s]" of the enumerated financial institutions. Logically, therefore, from a strictly textual perspective, it would seem beyond debate that the second, third and fourth paragraphs of § 1005 apply to anyone who engages in the specified prohibited activity.

However, for reasons discussed below, other courts have found that, with respect to the second and third paragraphs of § 1005 ("Paragraph Two" and "Paragraph Three," respectively), "this is one of those 'rare cases [where] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters, and those intentions must be controlling.'" *United States v. Barel*, 939

F.2d 26, 39 (3d Cir.1991) (*quoting Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982)); *see also United States v. Edwards,* 566 F.Supp. 1219, 1220 (D.Conn.1983). It falls to this Court to inquire whether the same should be said about Paragraph Four. In so doing, a brief review of the peculiar history of this statute and the few court decisions to interpret it is appropriate.

The first three paragraphs of § 1005 are derived from 12 U.S.C. §§ 592, 597 (1940). The substantive conduct proscribed by all three paragraphs was contained originally in a single paragraph that began with language limiting the provision expressly to "[a]ny officer, director, agent, or employee of any Federal Reserve bank, or of any member bank." *Edwards,* 566 F.Supp. at 1220–21 (*quoting* 40 Stat. 972, § 5209, 65 Cong. Sess. II, Ch. 177 (1918)). Subsequently, at the time of the 1948 revision and codification of the criminal code, Congress divided the single paragraph into three separate paragraphs, after which the limiting language appeared in Paragraph One only. However, as the District of Connecticut found in *Edwards,* "it is clear that all three of the pre–1948 revision statute's prohibitions, currently set forth in separate paragraphs in 18 U.S.C. § 1005, applied only to officer[s], director[s], agent[s], or employee[s] of protected banks." *Id.* at 1221 (internal quotation marks omitted). *Edwards* went on to observe that the Reviser's Note to § 1005 specifically stated that "no changes of meaning or substance were made except that … the different punishment provisions were reconciled, and one uniform punishment provision was adopted." *Id.* (*quoting* 18 U.S.C.A. § 1005, Historical and Revision Notes).

Consequently, *Edwards* held, "if the substance of the present § 1005 was to comport with that of its predecessor stat-

ute, then the third paragraph of § 1005 must be construed as applying only to bank officers, directors, agents, or employees, and not to the public at large or customers otherwise unconnected to the protected bank." *Id.* The Court further reasoned, "[u]nder the government's theory, § 1005 may be interpreted as a federal 'bad check' statute, under which anyone acting similarly in their capacity as a bank customer could be prosecuted for depositing worthless checks. This Court does not believe such a broad interpretation for the statute is either justified or warranted, not does it believe that § 1005 was intended to be a federal 'bad check' statute." *Edwards,* 566 F.Supp. at 1222.

In *Barel,* the Third Circuit considered the scope of Paragraph Three and followed *Edwards's* analysis and holding that § 1005 is limited to bank insiders. *See* 939 F.2d at 38–41. As the District of Connecticut had done before it, the Third Circuit noted its concern that an unrestricted reading would render § 1005 expansive, "enabl[ing] the government to use § 1005 to prosecute for tax avoidance, social security abuse and other related criminal fraud offenses already specifically prohibited by other sections of the United States Code." *Id. Barel* has since been cited with approval by another district court in this Circuit. *See United States v. Ortiz,* 906 F.Supp. 140, 144–46, n. 2 (E.D.N.Y.1995) (collecting cases and observing that "there are many cases which find bank employees or trustees or officers guilty [of violating § 1005], but none that find general customers guilty.").

To complicate matters somewhat, Paragraph Four's legislative history is different from that of Paragraphs One through Three. It was added to § 1005 as part of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), a legislative response to the wide-

spread failure of thrift banks during the late 1980s. Although the Third Circuit decided *Barel* after FIRREA's amendment to § 1005 and *Barel* referred generally to § 1005 as a whole in determining that the statute does not apply to non-bank insiders, *see* 939 F.2d at 41, the Third Circuit did not specifically address the independent origin of Paragraph Four, nor did the sufficiency of the indictment in *Barel* depend upon the scope of the new paragraph. Thus, *Barel's* guidance to this Court can go only so far.

Several years after *Barel*, the Eighth Circuit became the first court to consider Paragraph Four's scope directly. In *United States v. Van Brocklin*, 115 F.3d 587 (8th Cir.1997), the Eight Circuit found that Paragraph Four's independent origins rendered the meaning and legislative history of § 1005's first three paragraphs irrelevant. *See id.* at 597 ("We need not decide whether the Courts in *Edwards* and *Barel* correctly interpreted Congress' intent with regard to [P]aragraph [T]hree, because [P]aragraph [F]our has a much different history than the rest of § 1005."). Finding no indication in FIRREA's legislative history that Paragraph Four was intended to be limited to bank insiders, the Eighth Circuit looked to the plain language of the provision, and "decline[d] to read into paragraph four of § 1005 a class restriction that Congress did not itself mention." *Id.* Thus, according to the Eighth Circuit, Paragraph Four applies to *any person* who, "with intent to defraud . . . participates or shares in or receives funds derived from" a bank transaction, "regardless of whether he or she is a bank employee, officer, director, or agent." *Id.* This interpretation has since been followed by a district court in Utah. *See United States v. Christensen*, 344 F.Supp.2d 1294, 1296–97 (D.Utah 2004).

Upon review of the statute, its legislative history and the case law discussed above, the Court believes that *Van Brocklin* was too quick to disregard the construction of § 1005 adopted in *Barel* and *Edwards*. For, even if Paragraph Four has legislative origins different from those of the paragraphs that precede it, that does not mean that Paragraph Four should be construed entirely without reference to the remainder of the statute in which it resides. *See Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486, 126 S.Ct. 1252, 163 L.Ed.2d 1079 (2006) ("The definition of words in isolation, however, is not necessarily controlling in statutory construction. A word in a statute may or may not extend to the outer limits of its definitional possibilities. Interpretation of a word or phrase depends upon a reading of the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis.").

As an initial matter, the Court finds *Barel's*, *Edwards's* and *Ortiz's* importation of Paragraph One's bank insider restriction into Paragraphs Two and Three to be persuasive and based on a sound application of traditional principles of statutory construction. Indeed, the sole decision of which the Court is aware to adopt an unrestricted view of Paragraphs Two or Three looked only to the plain language of the statute and failed to consider the history of § 1005 detailed in *Edwards*. *See United States v. Edick*, 432 F.2d 350, 352–53 (4th Cir.1970).

Further, in its review of FIRREA's legislative history, *Van Brocklin* apparently did not consider the report of the Committee on Banking, Finance and Urban Affairs (the "Committee Report"), to which the bill was referred. The Committee Report states that one of the "primary purposes of [FIRREA was to] . . . enhance

the regulatory enforcement powers of the depository institution regulatory agencies to protect against fraud, waste and *insider abuse.*" H.R. Rep. 101–54(I), at 307–08 (1989) (emphasis added).[2]

Of course, there are times when divining the legislature's intent amounts to little more than a fool's errand. Paragraph Four might just as easily have been designed to address fraud and waste, more generally, as to address the more limited field of illicit bank transactions conducted by bank insiders. Similarly, in choosing to locate Paragraph Four within § 1005, as opposed to placing it elsewhere in some other provision of the United States Code, Congress may or may not have been aware of the unique history of § 1005, its inherent linguistic ambiguity, and the divergent construction assigned to it by the few courts to have considered it. Indeed, sometimes it is better not to inquire too closely into such matters, lest we project an appearance of purposefulness where none was ever intended to exist.

Whatever the intent, if any, behind the placement of Paragraph Four in § 1005, however, its current location and predicament must be acknowledged: Paragraph Four follows Paragraphs One, Two and Three, and there is ample support in FIR-REA's legislative history to find that Congress was concerned with regulating the conduct of bank insiders. There is no more ground to warrant a finding that Congress intended Paragraph Four as a generalized federal bank fraud statute than there is to find that Paragraphs Two and Three were intended to be "bad check" statutes, or a means to prosecute tax evasion, or social security fraud. Under these circumstances, importing into Paragraph Four the scope restriction that *Barel, Edwards* and *Ortiz* found to exist in Paragraphs Two and Three is by no means unreasonable.

*Van Brocklin* held its broad reading of Paragraph Four justified because "the conduct that the paragraph criminalizes— participation in or receipt of funds derived from a bank transaction with the intent to defraud ... [is not] the sort that, in most cases, would require insider status or access to bank records." 115 F.3d at 597. However, for that very same reason—the prospect of widespread application to essentially any person who transacts business with a bank with intent to defraud— both *Barel* and *Edwards* held that Paragraph Three must be narrowly construed. *See Barel*, 939 F.2d at 41 ("[T]he Government's interpretation ... would make a surprisingly broad range of unremarkable conduct a violation of federal law." (*quoting Williams v. United States*, 458 U.S. 279, 286, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982))); *Edwards*, 566 F.Supp. at 1222 (refusing to interpret § 1005 as a "federal 'bad check' statute, under which anyone acting simply in their capacity as a bank customer could be prosecuted for depositing worthless checks."). Moreover, the conduct that *Van Brocklin* would authorize the government to prosecute any person

---

**2.** The Committee Report goes on to explain, in a section entitled "Insider Abuse and Fraud":

> While the majority of thrifts are run by honest and dedicated management, it is clear that fraud and insider abuse has been a majority factor in a significant portion of thrift failures in the 1980's.... These institutions participated in rapid growth schemes and adopted risky investment strategies. Poor management techniques and unresponsiveness to regulatory appeals for change are also a hallmark of these institutions; so are high levels of compensation and extravagant expenditures. Regulators estimate that as many as 40% of thrift failures are due to some form of fraud or insider abuse.

H.R. Rep. 101–54(I), at 300–01.

for under Paragraph Four is already clearly defined as a crime under more generally applicable state and federal bank and wire fraud statutes such as, for example, 18 U.S.C. § 1344 ("§ 1344"). Notably, § 1344 was also subject to revision as part of FIRREA. Consequently, *Van Brocklin's* interpretation would imply that in enacting Paragraph Four, Congress did nothing more than declare unlawful conduct that was already unlawful. That Congress would engage in legislating a superfluous or meaningless statutory provision does not comport with principles of statutory construction. *See Bilski v. Kappos,* —— U.S. ——, 130 S.Ct. 3218, 3228–29, 177 L.Ed.2d 792 (2010).

■ "[T]he canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in criminal statute as to apply it only to conduct clearly covered." *United States v. Lanier,* 520 U.S. 259, 266, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997). Considering Paragraph Three, *Edwards* observed, "[h]ad congress wished to pass such a statute of general applicability ... it could have done so far more explicitly." 566 F.Supp. at 1222. This Court concurs, and finds that a correspondingly broad interpretation of Paragraph Four is "[n]either justified [n]or warranted." *Id.* Consequently, the Court holds that the scope of Paragraph Four should be limited to officers, directors, agents or employees of the specified banks.

Given, therefore, that the Indictment does not allege that Rubin, Zarefsky or Wolmark occupy the positions of such bank insiders, those portions of the Indictment alleging violations of § 1005 must be stricken or dismissed.

## D. *ZAREFSKY'S MOTION*

■ Finally, Zarefsky argues that Count Seven must be dismissed for improper venue because the entirety of the charged conduct at issue—the statements Zarefsky purportedly made to federal agents in Beverly Hills occurred in the Central District of California. The Court disagrees.

### 1. *Venue Requirements in Criminal Actions*

■ Under both Article III and the Sixth Amendment to the United States Constitution, "[t]he Trial of all Crimes ... shall be held in the State where the said Crimes shall have been committed." U.S. Const. art. III, § 2, cl. 3; *see also* U.S. Const. Amend. VI (guaranteeing speedy trial "by an impartial jury of the State and district wherein the crime shall have been committed"); *Ramirez,* 420 F.3d at 138. Accordingly, Rule 18 of the Federal Rules of Criminal Procedure provides that the "government must prosecute an offense in a district where the offense was committed." Fed.R.Crim.P. 18. If a defendant is charged with more than one count, venue must be proper with respect to each individual charge. *See United States v. Beech–Nut Nutrition Corp.,* 871 F.2d 1181, 1188 (2d Cir.1989).

■ "When a federal statute does not specify how to determine where the crime was committed, '[t]he *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it.'" *Ramirez,* 420 F.3d at 139 (*quoting United States v. Cabrales,* 524 U.S. 1, 6–7, 118 S.Ct. 1772, 141 L.Ed.2d 1 (1998)). This task requires the court to "identify the conduct constituting the offense" and then "discern the location of the commission of the criminal acts." *United States v. Rodriguez–Moreno,* 526 U.S. 275, 279, 119 S.Ct. 1239, 143 L.Ed.2d 388 (1999).

■ Where a crime consists of a "single, non-continuing act, it is 'committed' in the district where the act is performed." *Beech–Nut Nutrition Corp.*, 871 F.2d at 1188. However, where the acts constituting the charged crime implicate more than one location, "venue is properly laid in any of the districts where an essential element of the crime took place." *Ramirez*, 420 F.3d at 139 (*citing Rodriguez–Moreno*, 526 U.S. at 281, 119 S.Ct. 1239).

■ Pursuant to 18 U.S.C. § 3237(a), crimes characterized as "continuing offenses" may be prosecuted wherever a proscribed act occurs. *Id.* Still, courts must be wary of "extending that label [continuing offense] too broadly." *Id.* Thus, if, and only if, venue may lie in more than one district under a continuing offense theory, the court should then ask "whether the criminal acts in question bear substantial contact with any given venue." *United States v. Saavedra*, 223 F.3d 85, 93 (2d Cir.2000) (internal quotation marks omitted). This "substantial contacts" test considers "(1) the site of the crime, (2) its elements and nature, (3) the place where the effect of the criminal conduct occurs, and (4) suitability of the venue chosen for accurate factfinding." *Id.*

### 2. *Analysis*

The Government argues that while the § 1001 offense charged in Count Seven began during the interview with federal agents in the Central District of California, the offense continued and was completed in the Southern District of New York. The Government asserts that Zarefsky made his allegedly false statements to Manhattan-based FBI and IRS agents who memorialized them in a report prepared in Manhattan. Those statements were then conveyed to Antitrust Division attorneys in New York who were investigating bid rigging and fraud that occurred in the Southern District of New York. The Government further argues that Zarefsky's statements had the effect of impeding that investigation, as well as the investigation of the New York grand jury.

As a general matter, courts in this Circuit have regularly found § 1001 violations to be continuing offenses. *See, e.g., United States v. Kouzmine*, 921 F.Supp. 1131, 1136 (S.D.N.Y.1996) (collecting cases).' With respect to the distinctive set of facts at issue here, however, the situation is somewhat murkier. Significantly, two recent district court decisions evaluating false statements made to investigating agents in jurisdictions other than those where the prosecution was brought have reached contrary conclusions as to the impact of controlling Second Circuit precedent.

The seminal Second Circuit decision in this context is *United States v. Candella*, 487 F.2d 1223 (2d Cir.1973). In that case, the defendants were convicted in the Southern District of New York of violating § 1001 based on their filing of false affidavits and other documents seeking federal benefits. The documents were submitted to government employees in Brooklyn, who then forwarded the paperwork on to the Manhattan office of the city agency responsible for reviewing and processing the filings. The Second Circuit held that although the false statement offenses began in the Eastern District of New York (Brooklyn), they were completed in the Southern District of New York (Manhattan), "upon arrival in Manhattan where the decision was reached to make the funds available." *Id.* at 1228. The Court determined that "venue is properly laid in the 'whole area through which force propelled by an offender operates.'" *Id.* (*quoting United States v. Johnson*, 323 U.S. 273, 275, 65 S.Ct. 249, 89 L.Ed. 236 (1944)).

In *United States v. Bin Laden*, 146 F.Supp.2d 373 (S.D.N.Y.2001), the Court examined facts similar to those presented here in light of the standard set out in *Candella*. The defendant in *Bin Laden* was charged under § 1001 in the Southern District of New York based upon statements made to FBI agents during interviews conducted in Texas. The Court considered *Candella* and the decisions which followed it, many of which, like *Candella*, involved false statements filed in applications for federal benefits which traveled between offices in different federal districts. The Court found that the "shared factual characteristic [among those cases] is that there existed a geographic discontinuity between the defendant's physical *making* of the disputed statement, whether oral or written, and the actual *receipt* of that statement by the relevant federal authority." *Bin Laden*, 146 F.Supp.2d at 376. Given the perceived absence of "geographic (or even temporal) discontinuity" between the making and receipt of the *Bin Laden* defendant's statements, The Court held that the charged offense began, continued and was completed in Texas. *See id.* at 377.

Several years later, in *United States v. Mahaffy*, No. 05 Cr. 613, 2006 WL 2224518 (E.D.N.Y. Aug. 2, 2006), a court in the Eastern District of New York re-examined the issue in light of the intervening decision by the Second Circuit in *Ramirez*. *Ramirez*, like *Candella*, involved a defendant who filed false documents in New Jersey that were forwarded to the United States Department of Labor in Manhattan, where the prosecution was brought. Discussing *Candella*, the *Ramirez* Court had held, "[a]lthough enough was done in [*Candella*] in the Eastern District [of New York] to constitute a crime there ... it does not follow that the crime was then terminated, and that what transpired in Manhattan was irrelevant for venue pur-

poses." 420 F.3d at 143 (*quoting Candella*, 487 F.2d at 1228).

The *Mahaffy* defendants, who were prosecuted in the Eastern District of New York, were charged, like the defendant in *Bin Laden* (and Zarefsky, here), with making false statements to federal agents during an interview that occurred in another district. *See* 2006 WL 2224518, at *7 the *Mahaffy* Court read *Ramirez* to mean that *Candella* should be given an "expansive interpretation, essentially imposing strict liability for the making of false statements in assessing venue." *Id.*

Based on this reading of the Second Circuit precedent, the *Mahaffy* Court suggested that *Bin Laden* had been mistaken in viewing as dispositive the "geographic discontinuity" between the making and receipt of a defendant's statement. *Id.* at *9. It further opined that, in light of *Ramirez's* expansiveness, "the district court in *Bin Laden* might have ruled differently." *Id.* Instead, the *Mahaffy* Court found that

> it is the fact that the false statement actually makes its way into another district that establishes venue. Assuming that the FBI agents in *Bin Laden* were part and parcel of the Southern District of New York investigation, and that there was no "transfer" between any receiving agency in Texas and the prosecuting attorneys in the Southern District of New York, *Ramirez* nonetheless implies that the absence of a transfer need not undermine an application of the continuing offense doctrine.

*Id.* (citation omitted). *But see United States v. Carey*, 152 F.Supp.2d 415, 420 n. 6 (S.D.N.Y.2001) (distinguishing *Bin Laden* because the investigating agents in *Carey* were judicially appointed via consent decree and thus "emanat[ed]" from the district of prosecution).

Turning to the instant prosecution, the Court strains to identify the usefulness of *Bin Laden's* limiting principle—geographic discontinuity between sender and recipient—in light of *Ramirez* and *Candella.* For example, while there was no geographic or temporal discontinuity between Zarefsky making his statements in California and the federal agents' receipt of those statements in California, *Ramirez* and *Candella* suggest that those agents and that moment of receipt are not the last relevant actors or moment in the chain of transmission. Rather, the controlling Second Circuit authority indicates that the Court must consider that those "statements continued to be false and continued to be within the jurisdiction of the United States," when they were formally written up in New York by the interviewing agents, handed over to the Antitrust Division, and affected an ongoing New York investigation of the very activities that were the subject of Zarefsky's statements to the federal agents in California. *Ramirez,* 420 F.3d at 143 (*quoting Candella,* 487 F.2d at 1228).[3]

To be sure, "[i]f applied *ad absurdum*," this construction could produce potentially burdensome results, since, at first glance, "*Candella* and *Ramirez* allow for the possibility that venue might be proper in a district far removed from either the defendant's actual presence or any knowing or intended effect of his statements." *Mahaffy,* 2006 WL 2224518, at *9.[4] However, "[t]wo constraints rein the expansive reach of venue under *Candella.*" *Id.* Namely, the "substantial contacts" test set out under *Saavedra,* and the discretionary protections offered by Federal Rule of Criminal Procedure 21(b)'s venue transfer provision. *See id.*

Further, the facts here are distinguishable from those in *Bin Laden* in at least one important respect. In *Bin Laden,* the Court found it "most revealing" for its determination that the false statements offense began and ended in Texas that "among the four offense elements necessary to prove [the defendant's] § 1001(a)(2) violation, not one involves evidence arising out of this judicial district." 146 F.Supp.2d at 377. In this action, by contrast, evidence of, at minimum, the falsity of Zarefsky's statements arises out of, in part, telephone conversations recorded in the Southern District of New York.[5] *See*

3. Because this Court is constrained to follow the Second Circuit's guidance, the persuasive impact of the recent Tenth Circuit opinion in *United States v. Smith,* 641 F.3d 1200, 1207–08 (10th Cir.2011), whose facts were similar to those here and in *Bin Laden,* and which reached the same ultimate result as *Bin Laden,* is necessarily limited.

4. Indeed, Zarefsky attempts to distinguish the case at bar from *Mahaffy* based on the absence of any facts or allegations here which could show that Zarefsky knew about the pending investigation in New York or that his alleged false statements would be "propelled" here from California. Whether or not Zarefsky knew that the agents and the investigation were based in New York is unclear on the current record. It does bear noting that the subpoena served on CDR at the time of the

interview was issued by a Southern District of New York grand jury. More to the point, however, *Candella* does not appear to require "either knowledge or intent on the part of the defendant that that the [statements] would be delivered to [the district of prosecution]." *Mahaffy,* 2006 WL 2224518, at *8 (*citing Candella* 487 F.2d at 1228).

5. To satisfy its burden of proof under § 1001(a)(2), one of two subsections of § 1001 charged in Count Seven, the Government must prove (1) that the defendant made a material statement or representation; (2) the statement was false; (3) the false statement was made knowingly and willfully; and (4) the statement was made in a matter within the jurisdiction of the government of the United States. *See Bin Laden,* 146 F.Supp.2d at 377 n. 5.

also *United States v. Bush*, No. 07 Cr. 0072, 2007 WL 3131317, at *2 (S.D.Ala. Oct. 19, 2007) (dismissing count for improper venue where "the acts that occurred in [the district of prosecution] do not provide any evidence of the elements of Section 1001"). *But see Carey*, 152 F.Supp.2d at 420 (analyzing evidence of falsity as part of the "substantial contacts" test only after finding a continuing offense).

For these reasons, the Court finds that Zarefsky's alleged offense under § 1001 was a continuing offense which extended into the Southern District of New York.

 Turning next to the inquiry of "whether the criminal acts in question bear substantial contact with any given venue," *Saavedra*, 223 F.3d at 93 (internal quotation marks omitted), the Court notes as a preliminary matter that the "substantial contacts test is not a 'formal constitutional test,'" but rather is employed primarily "in order to determine whether a given venue is 'unfair or prejudicial' to the defendant." *Ramirez*, 420 F.3d at 143 (*quoting Saavedra*, 223 F.3d at 92). Since Zarefsky has not argued that being prosecuted in the Southern District of New York on Count Seven will cause him additional prejudice, hardship or undermine the fairness of his trial, the Court need not even engage in the *Saavedra* analysis. *See id.* Nonetheless, at least three substantial contacts considerations—namely, the elements and nature of the crime, the place where the effect of the criminal conduct is felt, and the suitability of venue for fact-finding—weigh in favor of venue in the Southern District of New York. This is particularly the case given the close relationship between the content of Zarefsky's alleged false statements, *i.e.*, Zarefsky's knowledge of the alleged criminal bid-rigging and fraud conspiracy, and the substance of the criminal prosecution which will in any event occur in this District.

For all of these reasons, Zarefsky's Motion to dismiss Count Seven for improper venue is denied, without prejudice to renewal at the conclusion of the Government's case or at the completion of the entire case. *See Mahaffy*, 2006 WL 2224518, at *10.

## III. ORDER

For the reasons discussed above, it is hereby

**ORDERED** that the motion (Docket No. 130) of defendants Rubin/Chambers, Dunhill Insurance Services, Inc.; David Rubin ("Rubin"); Zevi Wolmark a/k/a Stewart Wolmark; and Evan Andrew Zarefsky ("Zarefsky") (collectively, "Defendants") for an order dismissing Counts Two through Six of the Superseding Indictment (Docket No. 67) or, in the alternative, striking certain language from Counts Two through Six is DENIED; and further it is

**ORDERED** that Defendants' motion (Docket No. 133) for an order (1) dismissing Count Nine of the Superseding Indictment against Rubin and (2) striking all references to Defendants' alleged conspiracy to violate 18 U.S.C. § 1005 in Count Two of the Superseding Indictment is GRANTED; and further it is

**ORDERED** that Zarefsky's motion (Docket No. 127) to dismiss Count Seven of the Superseding Indictment for improper venue is DENIED.

**SO ORDERED.**